# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| AARYANA MALCOLM, LAVELL WILLIAMS, SHELLE BROOKS, Kristina Bohnenkamp, Carrie Casarez, Noelle Dubray, Pauline Hemicker, Kimberly Inabnit, Cassandra Kasowski, Kristen Martin, Joy Ramos, KELLY SORENSON RAFAI, KATHERINE REED, Chasstady Walker, *on behalf of themselves and a class of similarly-situated individuals*, | Civil Action No. 20-cv-2503 MJD/LIB |
| Petitioners, | **MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| M. STARR, *in her official capacity as Warden of the Federal Correctional Institution*, Waseca, and MICHAEL CARVAJAL, *in his official capacity as Director of the Bureau of Prisons*, | |
| Respondents. | |

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

Teresa Nelson (No. 0269736)
Ian Bratlie (No. 0319454)
Clare Diegel (No. 0400758)
Isabella Salomão Nascimento (No. 0401408)
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
Email:   tnelson@aclu-mn.org
        ibratlie@aclu-mn.org
        cdiegel@aclu-mn.org
        inascimento@aclu-mn.org

**BALLARD SPAHR LLP**

Wallace G. Hilke (No. 175857)
Jonathan M. Bye (No. 148830)
Leita Walker (No. 387095)
80 South Eighth Street
2000 IDS Center
Minneapolis, MN 55402-2119
Tel: (612) 371-3211

Email:   hilkew@ballardspahr.com
        byej@ballardspahr.com
        walkerl@ballardspahr.com

*Counsel for Petitioners*

## Table of Contents

Page

Facts ........................................................................................................................ 3

    I.    COVID-19 is an extremely contagious, dangerous disease particularly
harmful to people over 50 or with underlying conditions .............................. 3

    II.   Prisons like FCI-Waseca are ill-suited to manage COVID-19 .......................... 6

    III.  Respondents' spread of COVID-19 at FCI-Waseca ........................................... 8

    IV.  Respondents have failed to provide adequate medical care to infected
inmates ..................................................................................................... 18

    V.   Respondents are placing Petitioners at grave risk ........................................ 20

Legal Standards .................................................................................................. 22

Argument ........................................................................................................... 23

    I.    Petitioners will likely succeed on the merits ................................................ 23

        A.    Respondents are violating Petitioners' Eighth Amendment rights ........ 23

        B.    Respondents are violating the Rehabilitation Act ............................... 29

    II.   Irreparable harm is likely ............................................................................ 32

    III.  The balance of equities and the public interest favor releasing
vulnerable inmates and complying with CDC guidelines .............................. 34

    IV.  The Court shouldn't require a bond ............................................................. 35

Conclusion ......................................................................................................... 36

# TABLE OF CASES

**Page(s)**

**Cases**

*Alexander v. Choate*,
    469 U.S. 287 (1985) ........................................................................... 29

*Banks v. Booth*,
    459 F. Supp. 3d 143 (D.D.C. 2020) ............................................. 24, 28, 33

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) ........................................................... 22

*Brown v. Plata*,
    563 U.S. 493 (2011) ........................................................................... 28

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................... 22

*Carmichael v. Birmingham Saw Works*,
    738 F.2d 1126 (11th Cir. 1984) ......................................................... 22

*Castillo v. Barr*,
    449 F. Supp. 3d 915 (C.D. Cal. 2020) ............................................... 33

*Dataphase Sys. Inc. v. CL Sys.*,
    640 F.2d 109 (8th Cir. 1981) ............................................................. 22

*Davis v. Oregon Cty.*,
    607 F.3d 543 (8th Cir. 2010) ............................................................. 23

*DeGidio v. Pung*,
    920 F.2d 525 (8th Cir. 1990) ............................................................. 24

*Durand v. Fairview Health Servs.*,
    902 F.3d 836 (8th Cir. 2018) ......................................................... 29, 31

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................... 32

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ............................................................................. 23

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .............................................................. 23, 24

*Frazier v. Kelley*,
    460 F. Supp. 3d 799 (E.D. Ark. 2020) ........................................ 33

*Gallagher v. City of Clayton*,
    699 F.3d 1013 (8th Cir. 2012) ................................................... 34

*Gibson v. Ark. Dep't of Corr.*,
    265 F.3d 718 (8th Cir. 2001) ..................................................... 34

*Gregg v. Georgia*,
    428 U.S. 153 (1976) .................................................................. 23

*Harris v. Blue Cross Blue Shield of Mo.*,
    995 F.2d 877 (8th Cir. 1993) ..................................................... 33

*Helling v. McKinney*,
    509 U.S. 25 (1993) .................................................................... 23

*Henderson v. Bodine Aluminum, Inc.*,
    70 F.3d 958 (8th Cir. 1995) ....................................................... 33

*Kai v. Ross*,
    336 F.3d 650 (8th Cir. 2003) ..................................................... 33

*Martinez-Brooks v. Easter*,
    459 F. Supp. 3d 411 (D. Conn. 2020) ......................... 24, 25, 28, 33

*Maxwell v. Olmsted Cty.*,
    No. CV 10-3668, 2012 U.S. Dist. LEXIS 17472 (D. Minn. Feb. 13,
    2012) ........................................................................................ 31

*Meyer v. Brown & Root Constr. Co.*,
    661 F.2d 369 (5th Cir. 1981) ..................................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................. 34

*Pavek v. Simon*,
    No. 19-cv-3000, 2020 U.S. Dist. LEXIS 103989 (D. Minn. June 15,
    2020) ........................................................................................ 32

*Phelps-Roper v. Nixon*,
545 F.3d 685 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ....................................... 34

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
530 F.3d 724 (8th Cir. 2008) ................................................................ 34

*Portz v. St. Cloud State Univ.*,
196 F. Supp. 3d 963 (D. Minn. 2016) ...................................................... 32

*Richards v. Minnesota*,
No. CV 13-3029, 2016 U.S. Dist. LEXIS 164655 (D. Minn. Nov. 29, 2016) ............................................................................................... 30

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ............................................................... 35

*S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*,
877 F.2d 707 (8th Cir. 1989) ................................................................. 22

*Thakker v. Doll*,
451 F. Supp. 3d 358 (M.D. Pa. 2020) ................................................. 33, 35

*Torres v. Milusnic*,
No. CV 20-4450-CBM-PVC(x), 2020 U.S. Dist. LEXIS 131446 (C.D. Cal. July 14, 2020) ............................................................................ 28, 33

*United States v. Rodriguez*,
451 F. Supp. 3d 392 (E.D. Pa. 2020) ........................................................ 7

*Wilson v. Williams*,
961 F.3d 829 (6th Cir. 2020) .............................................................. 24, 33

*Wragg v. Ortiz*,
462 F. Supp. 3d 476 (D.N.J. 2020) .......................................................... 24

## Introduction

"*Bringing positive inmates into a facility that doesn't have any infections and watching it erupt—there's no denying it's a screw-up. It just blows my mind they did this.*"  —Corrections officer at FCI-Waseca.[1]

Petitioners are inmates at FCI-Waseca, a low-security women's prison, who, because of their age or other factors, are highly vulnerable to COVID-19. That disease has spread like wildfire through FCI-Waseca, infecting more than 70% of its inmates. Respondents, by blatantly disregarding BOP policies and DOJ and CDC guidance, lit that wildfire and continue to stoke it. Absent a TRO, Petitioners face serious illness and death as Respondents continue violating Petitioners' constitutional and statutory rights by condemning them to close quarters without adequate social distancing and other COVID-19 prevention and treatment measures.

Over the past several months, Respondents have ignored the risks of COVID-19, intermingling infected inmates with healthy ones, failing to provide even the most basic personal protective equipment ("PPE") and cleaning supplies, failing to require staff and inmates to wear the PPE they do provide, and leaving the sickest inmates to self-medicate and sleep on wet floors. Even now, they ignore the risks of infection, re-infection, and death by regularly busing-in new inmates; serving meals in a crowded cafeteria; having inmates from one unit serve food to inmates in other units; having inmates work overtime

---

[1]     Keegan Hamilton, *A Super-Spreader Jail Keeps Sparking COVID Outbreaks Across the US*, VICE NEWS (Oct. 13, 2020), https://www.vice.com/en/article/889w8p/a-super-spreader-jail-keeps-sparking-covid-outbreaks-across-the-us.

at a crowded prison factory; and failing to meaningfully exercise their authority to protect prisoners from illness and death by releasing them from custody or to home confinement.

In the face of such wanton indifference, the Court should order Respondents to release or home-confine all women in the proposed class currently or in the future imprisoned at FCI-Waseca during the COVID-19 pandemic.[2] In the alternative, it should order Respondents to implement and enforce social distancing, quarantine, and other measures set forth in Petitioners' proposed order. Such relief won't only protect the Class from irreparable harm, it will protect Respondents' staff and the public living in surrounding communities.

---

[2]      The Class is: All persons currently or in the future imprisoned at FCI-Waseca during the COVID-19 pandemic who are 50 and older or who have: cancer; chronic kidney disease; chronic obstructive pulmonary disease (COPD); immunocompromised from solid organ transplant; obesity with a body-mass index (BMI) of 30 or more; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; type II diabetes mellitus; asthma (moderate to severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or other immune-suppressing medications; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis; smoking; thalassemia; type I diabetes mellitus.

Petitioners Brooks, Malcolm, Walker, and Williams ("Subclass III Petitioners") also seek to represent Subclass III consisting of all current and future inmates at FCI-Waseca who are medically vulnerable because of a disability as defined in the Rehabilitation Act , 29 U.S.C. § 701 *et seq.*

**Facts**

## I.  COVID-19 is an extremely contagious, dangerous disease particularly harmful to people over 50 or with underlying conditions.

SARS-CoV-2, the causal pathogen of the COVID-19 disease, is extremely infectious and deadly,[3] causing a global pandemic[4] and national and state emergencies.[5] As of December 10, nearly 70,000,000 have tested positive for COVID-19, and more than 1,500,000 have died.[6] In the U.S., more than 15,500,000 have tested positive; nearly 300,000 have died.[7]

The catastrophic consequences of the pandemic are due to (1) ease of transmissibility and (2) severity of the disease.[8] The virus is transmitted through respiratory

---

[3]  Franco-Paredes Decl. ¶ 8; Baston Decl. ¶¶ 9, 12.

[4]  The WHO declared COVID-19 a pandemic on March 11, 2020. *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 Mar. 2020*, WHO (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[5]  *See* President Trump, *Proclamation on Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; Gov. Walz, Emergency Exec. Order 20-01, *Declaring a Peacetime Emergency & Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19* (Mar. 13, 2020), https://mn.gov/governor/assets/EO%2020-01_tcm1055-422957.pdf.

[6]  *COVID-19 Dashboard by the Ctr. for Sys. Sci. & Eng'g (CSSE)*, Coronavirus Res. Ctr., Johns Hopkins Univ., https://coronavirus.jhu.edu/map.html (last visited Dec. 10, 2020).

[7]  *Id.*

[8]  Franco-Paredes Decl. ¶ 9.

droplets,[9] meaning one may become infected through close contact with an infected individual (even if asymptomatic), or by touching virus-laden surfaces and then touching one's mouth, nose, or eyes.[10]

As to its severity, the overall COVID-19 fatality-rate is estimated at 3.5% (more than 35 times that of flu).[11] Approximately 20% of cases require medical intervention[12] and it can trigger Acute Respiratory Distress Syndrome,[13] which has a 40% mortality rate.[14] COVID-19 can also cause grave injury to the heart and trigger immune system over-response, worsening a patient's outcome[15] and damaging other organs or causing death.[16]

---

[9]   *What you should know about COVID-19 to protect yourself and others* ("COVID-19 Fact Sheet"), CDC (June 1, 2020), http://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[10]   *Id.*; Franco-Paredes Decl. ¶ 30; Baston Decl. ¶ 26.

[11]   Baston Decl. ¶ 12.

[12]   Baston Decl. ¶ 13; Franco-Paredes Decl. ¶ 23; Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus?* THE GUARDIAN (Mar. 24, 2020), https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.

[13]   Franco-Paredes Decl. ¶ 16 (also explaining COVID-19 can severely damage lung tissue, causing permanent loss of respiratory capacity); Baston Decl. ¶ 15; Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19—Even in His Young Patients*, PROPUBLICA (Mar. 21, 2020) ("Presser"), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[14]   Baston Decl. ¶ 15; Presser, note 13 *supra*.

[15]   Franco-Paredes Decl. ¶ 18.

[16]   *Id.* ¶¶ 18, 19.

COVID-19 survivors report lingering, debilitating symptoms,[17] representing new morbidities, which may increase vulnerability upon reinfection (discussed below).[18]

Two factors increase COVID-19's severity. First, its severity is directly proportional to viral load, the measurable virus upon exposure.[19] Second, its severity varies significantly depending on certain demographic and underlying health factors.[20] At high risk are older adults[21] and people with underlying medical conditions (collectively, "medically vulnerable individuals").[22]

---

[17]   *Malam v. Adducci*, 20-cv-10829-JEL-APP (E.D. Mich.), ECF No. 373-9, Exh. 8, ("*Malam* Exh. 8") ¶ 28.

[18]   *Malam* Exh. 8, ¶ 28.

[19]   Franco-Paredes Decl. ¶ 20 & nn.12–14 (citing studies).

[20]   Baston Decl. ¶ 14.

[21]   Individuals over 50 are more vulnerable to COVID-19, and those over 70 face a higher risk of death from the disease. Franco-Paredes Decl. ¶ 14; *Coronavirus Disease 2019 (COVID-19), Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[22]   *Coronavirus Disease 2019 (COVID-19), People at Increased Risk*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

Contracting COVID-19 doesn't confer permanent immunity;[23] immunity may only last 90 days.[24] Re-infected patients may suffer worse outcomes than from their first infection.[25]

## II.   Prisons like FCI-Waseca are ill-suited to manage COVID-19.

Prisons across the country have been overrun with the virus,[26] highlighting the ease of transmission in congregate-living environments.[27] Prisons are epicenters for infectious diseases,[28] including, COVID-19,[29] because of how they're designed and operated.[30] FCI-Waseca is no exception.

---

[23]   Threat Assessment Br., *Reinfection with SARS-CoV-2: public health response*, Eur. Ctr. for Disease Prevention & Control (Sept. 21, 2020), at 2-3; Franco-Paredes Decl. ¶ 22; Baston Decl. ¶ 21.

[24]   *Coronavirus Disease 2019 (COVID-19), Duration of Isolation & Precautions for Adults with COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html; *Malam* Exh. 8, ¶ 34.

[25]   Akiko Iwasaki, *What reinfection means for COVID-19*, THE LANCET (Oct. 12, 2020), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30783-0/fulltext; Franco-Paredes Decl. ¶ 22; Press Releases, "Inmate Death at FCI Butner (Low)," U.S. DOJ, Federal BOP (Sept. 17, 2020), https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf.

[26]   *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Nov. 12, 2020).

[27]   Franco-Paredes Decl. ¶¶ 25–26; Baston Decl. ¶¶ 22-24; Sullivan Decl. ¶ 23.

[28]   Franco-Paredes Decl. ¶ 25 & n.23; Baston Decl. ¶ 22.

[29]   Franco-Paredes Decl. ¶ 29 & n.25; Sarah Volpenhein, *Marion prison coronavirus outbreak seeping into larger community*, MARION STAR (Apr. 25, 2020), https://www.marionstar.com/story/news/local/2020/04/25/marion-prison-ohio-coronavirus-outbreak-seeping-into-larger-community/3026133001/; Anat Rubin et al., *Inside the U.S.'s Largest Maximum Security Prison, COVID-19 Raged. Outside, Officials Called Their Fight a Success.*, PROPUBLICA (June 24, 2020), https://www.propublica.org/article/inside-the-uss-largest-maximum-security-prison-covid-19-raged.

[30]   Franco-Paredes Decl. ¶¶ 27–28; Baston Decl. ¶ 24 & n.5; Sullivan Decl. ¶ 23.

First, prisons typically lack room to allow compliance with CDC social distancing guidance;[31] they are designed for close-quarters, presenting constant opportunity for transmission.[32]

Second, non-porous surfaces, including metal, on which the virus survives[33] are prevalent.[34] Given the numbers who touch "high touch areas," such as shared phones, tables, chairs, and faucets, CDC guidance dictates almost constant disinfection.[35]

Third, prisons are often poorly-ventilated, with poorly-circulating, shared, and recycled air, further promoting virus spread.[36]

Fourth, the manner in which inmates are shuffled makes prisons viral hotbeds. Specifically, to "quarantine" COVID-19-positive or suspected cases, inmates are often segregated in disciplinary units (e.g. solitary confinement) or in cohort groups in singular open locations.[37] These measures are problematic because: (1) using disciplinary

---

[31]   Franco-Paredes Decl. ¶ 27; *United States v. Rodriguez*, 451 F. Supp. 3d 392, 402–03 (E.D. Pa. 2020).

[32]   Franco-Paredes Decl. ¶ 32; Bohnenkamp Decl. ¶¶ 13, 18; Brooks Decl. ¶ 8; Casarez Decl. ¶ 9; Dubray Decl. ¶ 15.

[33]   The virus is thought to survive twenty-four hours on cardboard, two days on plastic, and three days on steel. Neeltje van Doremalen et al., Correspondence, *Aerosol & Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med. (Mar. 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973..

[34]   Franco-Paredes Decl. ¶ 28.

[35]   Franco-Paredes Decl., ¶ 28; Sullivan Decl. ¶¶ 24, 38.

[36]   Franco-Paredes Decl. ¶ 32. Unit A's basement, for example, is windowless; fans circulate air throughout. Walker Decl. ¶ 19.

[37]   Franco-Paredes Decl. ¶ 31; Sullivan Decl. ¶¶ 20, 27.

mechanisms deters self-reporting symptoms, contributing to viral spread,[38] (2) cohorting exposes individuals to higher viral loads, linked to more severe disease outcomes,[39] and (3) moving staff, inmates, contractors, and others throughout prisons risks further cross-contamination.[40]

## III.   Respondents' spread of COVID-19 at FCI-Waseca.

Due to Respondents' refusal to implement basic CDC recommendations, when COVID-19 came to FCI-Waseca, it spread like wildfire: by October 2020, approximately 454 inmates, or more than 70%, had tested positive.[41] By comparison, by the end of October, less than 3% of Minnesota residents had tested positive.[42] Rather than protecting the inmates in their care, Respondents started, and then stoked, the fire.

_Respondents' failure to reduce the population exacerbated inmates' inability to socially distance._ FCI-Waseca's quarters are tight for its 635 residents.[43] Inmates live in "ranges" in one of five units (A-E). Within each range are bedrooms, most with multiple bunkbeds a few feet apart,[44] and communal toilets, sinks, showers, phones, and

---

[38]   Franco-Paredes Decl. ¶ 31; Sullivan Decl. ¶ 28.

[39]   Franco-Paredes Decl. ¶ 33 & notes, 19 _supra_.

[40]   Franco-Paredes Decl. ¶ 29; Sullivan Decl. ¶ 26.

[41]   _COVID-19 Coronavirus_, note 26 _supra_.

[42]   U.S. Census Bureau, _Quick Facts Minnesota_; _Minnesota Coronavirus Map and Case Count_, https://www.census.gov/quickfacts/MN; _Weekly COVID-19 Report,_ MN Dept. of Health (Oct. 29, 2020), https://www.health.state.mn.us/diseases/coronavirus/stats/covidweekly44.pdf.

[43]   _See Generate Inmate Population Reports, Facility: Waseca_, https://www.bop.gov/about/statistics/population_statistics.jsp.

[44]   For example, one 10-by-15-foot room in Unit A contains five bunkbeds. Bohnenkamp Decl. ¶ 18; Inabnit Decl. ¶ 32; Brooks Decl. ¶ 8.

computers.[45] Inmates must closely congregate to receive meals and medications, watch television, or use the computers and telephones, which are infrequently disinfected.[46] Social distancing is impossible.[47] Meanwhile, in July, UNICOR[48] doubled its FCI-Waseca workforce, crowding an already-packed warehouse with inmates working within arm's length.[49] Inmates working at UNICOR have tested positive and, accordingly, exposed fellow workers.[50]

Because prisons like FCI-Waseca aren't equipped to comply with CDC guidelines, health experts recommend medically-vulnerable individuals be released, protecting them and, simultaneously, leaving remaining inmates better able to follow CDC guidance.[51] Respondents had the power to follow this guidance and release inmates under the

---

[45]    Bohnenkamp Decl. ¶ 13; Dubray Decl. ¶ 25; Hemicker Decl. ¶ 7; Inabnit Decl. ¶ 31. Around 50 inmates on the top floor of Unit A share four toilets and two showers (the other showers are non-operational). Kasowski Decl. ¶ 13.

[46]    Brooks Decl. ¶¶ 46-50, 64. Sixteen inmates share the 10-by-15-foot common area in Unit A's basement. Bohnenkamp Decl. ¶ 22.

[47]    *See, e.g.*, Bohnenkamp Decl. ¶ 9; Casarez Decl. ¶¶ 9, 23; DuBray Decl. ¶ 15; Hemicker Decl. ¶ 7.

[48]    UNICOR/Federal Prison Industries, Inc., is a government-owned corporation.- Its revenues exceeded $600 million in 2018 and 2019. https://www.unicor.gov/publications/reports/FY2019_AnnualMgmtReport.pdf at 16.  Its prisoner employees make less than $1/hour. Hemicker Decl. ¶ 18.

[49]    Sorenson Rafai Decl. ¶¶ 6-7; Hemicker Decl. ¶¶ 15, 17; Kasowski Decl. ¶ 17; Williams Decl. ¶ 18.

[50]    Kasowski Decl. ¶ 18.

[51]    Franco-Paredes Decl. ¶¶ 35, 55–56; Baston Decl. ¶ 116; Sullivan Decl. ¶ 33; *Malam* Exh. 8, ¶ 47.

Coronavirus Aid, Relief, and Economic Security ("CARES") Act or the compassionate release statute.

Congress passed the CARES Act authorizing BOP to lengthen the time prisoners can be home-confined, provided the Attorney General ("AG") finds "emergency conditions will materially affect the functioning of the Bureau." Pub. L. 116-136.  AG Barr so found on April 3 and directed BOP to "move with dispatch in using home confinement . . . to move vulnerable inmates out of these institutions," and to "begin implementing this directive immediately," noting "time is of the essence."[52]

On April 22, BOP purported to interpret AG Barr's guidance, but significantly curtailed those who qualify for home confinement.[53] Respondents imposed unnecessary and impractical barriers to release, including (but not limited to), requiring inmates to show they would have both a lower risk of contracting COVID-19 outside the prison and a 90-day supply of medication.[54] While BOP doesn't publish the numbers of home confinement denials, Petitioners' experiences show it used arbitrary and inconsistently-applied factors.

For example, after Petitioner Ramos applied for home confinement in April, she was informed she was ineligible because she hadn't served 50% of her sentence, a criterion

---

[52]    Office of the AG, *Increasing Use of Home Confinement at Insts. Most Affected by COVID-19* (Apr. 3, 2020), https://www.fd.org/sites/default/files/covid19/bop_jail_polici es_and_information/barr_memo_caresact_apr3_2020.pdf, ("Barr Mem.") at 1, 2.

[53]    *Mem. from Corr. Programs Div. Acting Assistant Director Andre Matevousian & Reentry Servs. Div. Assistant Director Hugh J. Hurwitz to Chief Exec. Officers* (Apr. 22, 2020) ("BOP Mem."), ps://www.bop.gov/coronavirus/docs/bop_memo_home_confineme nt_april3.pdf.

[54]    BOP Mem., note 52 *supra*.

Respondent Carvajal created to "triage" CARES Act release.[55] Around that time, however, BOP released Paul Manafort after he had served only 30% of his time.[56] By October, Ramos had served more than half her sentence and reapplied.[57] But by then, BOP was only approving inmates with a "minimum" security level—a level Ramos *did* have in June, before BOP changed how it assessed security levels.[58] Meanwhile, Williams was given two release dates, only to have those reversed for "safety concerns," though she has no prior convictions for violent offenses.[59] Similarly, Casarez received a home-confinement date, only to have her release blocked.[60] Respondent Starr approved Brooks for home confinement but that decision was also reversed.[61] Thus, despite the CARES Act's explicit authority to home confine any inmate, and despite AG Barr's direction for immediate action, Respondents' use of their authority has been unnecessarily restrictive.[62]

Respondents also failed to reduce population under 18 U.S.C. § 3582(c)(1)(A), through "compassionate release." This statute allows BOP to request prison-term

---

[55]    Ramos Decl. ¶ 20; *see also* Testimony by BOP Director Carvajal to U.S. Senate Judiciary Committee at 2:02:50-2:03:05 (June 2, 2020), https://www.c-span.org/video/?472615-1/senate-judiciary-hearing-prison-safety-coronavirus-pandemic.

[56]    Justine Coleman, *Manafort Released to Home Confinement due to coronavirus concerns*, THE HILL (May 13, 2020), https://thehill.com/regulation/court-battles/497495-manafort-released-to-home-confinement-due-to-coronavirus-concerns.

[57]    Ramos Decl. ¶ 20.

[58]    *Id.*

[59]    William Decl. ¶ 32, Ex. A at 14.

[60]    Casarez Decl. ¶ 27.

[61]    Brooks Decl. ¶ 13.

[62]    *See, e.g.*, Williams Decl. ¶; Ramos Decl. ¶ 20; Bohnenkamp Decl. ¶ 27; Casarez Decl. ¶ 27.

reductions when "extraordinary and compelling reasons" exist. 18 U.S.C. § 3582(c)(1)(A)(i), Since the COVID-19 crisis began, it doesn't appear BOP has updated its policies regarding "extraordinary and compelling reasons" warranting a prison-term reduction. Moreover, it doesn't appear Respondents make good use of their compassionate release authority.[63]

By failing to release eligible inmates to allow for social distancing—the "most basic and imperative method to control the spread of COVID-19"[64]—Respondents disregarded the substantial risk that COVID-19 posed to Petitioners and other medically-vulnerable inmates at FCI-Waseca. And instead of decreasing the population, Respondents bused-in more.

_Respondents knowingly contaminated infection-free living units._ According to a BOP-staff union complaint filed with OSHA ("OSHA Complaint"), BOP "continuously mov[es] inmates by bus and/or airlift to various prison sites [including FCI-Waseca] [,] . . . authorize[s] movement of infected inmates, inmates suspected of being infected, inmates who have been [exposed], . . . to facilities that otherwise have not shown signs of any introduction of the virus, thus introducing the virus into an uninfected area."[65].

---

[63]     _See,_ Kasowski Decl. ¶ 22, Ex. A at 3, 7; Casarez Decl. ¶ 28; Williams Decl. ¶ 33, Ex. A at 1-3; Inabnit Decl. ¶¶ 26-27, Exs. B, D.

[64]     Sullivan Decl. ¶ 23.

[65]     _Notice of Alleged Safety or Health Hazards_, OSHA, U.S. Dep't of Labor (Mar. 31, 2020), https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf; _see, e.g.,_ Keegan Hamilton, _'Con Air' is Spreading COVID-19 All_

That's exactly what happened at FCI-Waseca:  In August, Respondents imported inmates from Grady County Jail, Oklahoma, despite its known reports of COVID-19.[66] Worse, when asking these inmates whether they'd been exposed to COVID-19, FCI-Waseca staff encouraged them to answer "no."[67] Petitioner Inabnit told a nurse she had COVID-19 symptoms (a runny nose, headache and body aches)—yet was placed with 21 other newly-arrived inmates in the dormitory-style rooms of Unit A.[68] Within days, nearly all these new inmates tested positive.[69]

Less than three weeks later, all but 29 of the 100-plus inmates in Unit A, new and old alike, tested positive. Those who weren't positive were locked in the basement range; ultimately all but about *eight* in Unit A contracted COVID-19.[70] As one FCI-Waseca corrections officer acknowledged, Respondents' decision to bring "positive inmates into a facility that doesn't have any infections and watching it erupt—there's no denying it's a screw-up. It just blows my mind they did this."[71]

Respondents then stoked the fire they lit—nonsensically, they transferred healthy inmates *into* infected ranges, and refused to transfer healthy inmates *out of* infected ranges.

---

*Over the U.S. Prison Sys.*, VICE NEWS (Aug. 13, 2020), https://www.vice.com/en/article/wxqbzw/con-air-is-spreading-covid-19-all-over-the-us-prison-system.

[66] At least one of them—Petitioner Inabnit—had written grievances about the appalling and risky conditions at the jail. Inabnit Decl. ¶¶ 6, 7.

[67] *See id.* ¶ 15.

[68] *See id.* ¶ 15.

[69] *Id.* ¶ 17.

[70] *See* Dubray Decl. ¶ 24.

[71] *Super-Spreader Jail,* note 1, *supra.*

For example, in October, FCI-Waseca told Petitioner Reed it intended to transfer her from Unit E—the only COVID-19-free unit—to Unit A, COVID-19 ground-zero.[72] The explanation was that Unit A is the low-security camp unit at FCI-Waseca and Reed qualified for it.[73] When Reed understandably objected, she was threatened with being locked in the Special Housing Unit ("SHU"),[74] usually used for punishment.[75] Conversely, Respondents refused Petitioner Kasowski's request to move from the highly-infected camp unit, because she wasn't "disruptive" enough to leave the minimum-security setting.[76]

   *Respondents, in effect, punish inmates for contracting COVID-19, deterring self-reporting.* Respondents locked COVID-19-positive and newly-arrived inmates in the SHU.[77] Normally used for punishment, its inmates are denied their personal property and only have blankets, mattresses, pillows, and hygiene items.[78] The SHU rooms are small, concrete, and stuffy;[79] at least one has black mold.[80] Each has a door with a tiny window and a slot for food trays.[81] Most contain a bunkbed with mattresses no thicker than a yoga

---

[72]   Reed Decl. ¶¶ 32-33.

[73]   *Id.* ¶ 33.

[74]   *Id.* ¶ 36.

[75]   Caserez Decl. ¶ 17.

[76]   Kasowski Decl. ¶¶ 5, 21.

[77]   Sorenson Rafai Decl. ¶¶ 12, 19; Martin Decl. ¶ 7 Ramos Decl. ¶¶ 10, 15; Williams Decl. ¶ 12; Inabnit Decl. ¶¶ 16, 20; Walker Decl. ¶ 4; Casarez Decl. ¶ 17.

[78]   *Fed. Corr. Inst., Waseca, Minn., Admissions & Orientation Handbook* (revised Mar. 14, 2017) ("*FCI- Waseca Handbook*") at 51, https://www.bop.gov/locations/institutions/was/was_ao_handbook_eng_031517.pdf.

[79]   *See* Martin Decl. ¶ 12; Walker Decl. ¶ 9; Inabnit Decl. ¶ 19.

[80]   Walker Decl. ¶ 7.

[81]   Martin Decl. ¶ 12.

mat,[82] a concrete-slab table, stool, and built-in toilet and shower.[83] Above eye-level is a small window.[84]

After testing positive or arriving at FCI-Waseca, some Petitioners were brought in handcuffs to the SHU and treated as if being punished.  They were forced to change from general-population clothing into orange SHU uniforms.[85] They weren't allowed to leave the room, except to go to a dirty supply closet to use a nebulizer.[86] Nor were they allowed personal property.[87] While there, most weren't able to call family or attorneys.[88] Although SHU inmates are entitled to receive the same meals as the general population,[89] at least one Petitioner was served moldy food and expired milk.[90] Perhaps worse, Respondents placed medically-vulnerable prisoners in the SHU alongside infected prisoners and failed to distinguish for staff who was and wasn't infected.[91]

_Respondents have failed to provide adequate PPE and cleaning supplies._ Before and during the outbreak, inmates received untreated cotton masks made by UNICOR that

---

[82]    Ramos Decl. ¶ 12; Martin Decl. ¶ 12.

[83]    Ramos Decl. ¶ 12.

[84]    Martin Decl. ¶ 12.

[85]    Martin Decl. ¶ 11.

[86]    Martin Decl. ¶ 13; Williams Decl. ¶ 13.

[87]    Sorenson Rafai Decl. ¶¶ 12, 16; _see also_ Martin Decl. ¶ 14; Williams Decl. ¶ 11; Ramos Decl. ¶ 15.

[88]    Williams Decl. ¶ 14; Martin Decl. ¶ 13; Inabnit Decl. ¶ 20 (stating Respondent Starr didn't consider COVID-19 "detrimental enough" for prison staff to inform emergency contacts of prisoner's sickness).

[89]    _FCI-Waseca Handbook_, note 77 _supra_.

[90]    Martin Decl. ¶ 16.

[91]    Reed Decl. ¶ 23; Walker Decl. ¶ 5.

fall apart and are prohibited from making improved versions for themselves.[92] Meanwhile, staff were initially given only gloves (not masks or other PPE), including when interacting with inmates being transported for hospitalization.[93] Even now, mask wearing isn't enforced, and some staff refuse inmate requests to wear one.[94]

Beyond the flimsy masks and failure to enforce their use, Respondents haven't provided adequate PPE or sufficient cleaning supplies,[95] even though inmates maintain responsibility for cleaning and sanitizing their spaces.[96] Petitioner Bohnenkamp resorted to wiping down high-touch surfaces with sanitary napkins.[97] Respondents also fail to give inmates responsible for cleaning common areas gloves,[98] training to ensure compliance with CDC standards, and sufficient opportunities to clean. The few hand-sanitizing stations available to inmates are frequently empty.[99]

---

[92]    *See* Kasowski Decl. ¶ 16; Brooks Decl. ¶ 52.

[93]    Joseph Neff & Keri Blakinger, *Fed. Prisons Agency "Put Staff in Harm's Way" of Coronavirus: Orders at Oakdale La. Help Explain COVID-19 Spread*, THE MARSHALL PROJECT (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

[94]    *See* Bohnenkamp Decl. ¶ 24; Williams Decl. ¶ 7; Brooks Decl. ¶¶ 51, 53; Walker Decl. ¶ 19; Casarez Decl. ¶ 14; Inabnit Decl. ¶ 33.

[95]    *See* Bohnenkamp Decl. ¶ 20; Kasowski Decl. ¶ 13; Brooks Decl. ¶ 43.

[96]    *FCI-Waseca Handbook*, note 77 *supra*.

[97]    Williams Decl. ¶ 30; Bohnenkamp Decl. ¶ 20.

[98]    *Cleaning & Disinfecting Your Facility – How to clean and disinfect*, https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html; Williams Decl. ¶ 31.

[99]    Brooks Decl. ¶ 33.

*Respondents permit staff to move regularly between infected and quarantine ranges and virus-free areas.* Respondents haven't required staff to properly use and dispose of PPE, even after going into ranges where women have tested COVID-19 positive.[100] Further, Respondents permit staff to move between infected and uninfected ranges, rather than assigning staff to specific ranges to reduce cross-contamination.[101]

Perhaps the most egregious example of Respondents' dangerous practices involves Officer "W." Before the cafeteria reopened on November 23, Officer W served food trays in Unit A's infected ranges and then served uninfected ranges. Officer W requested assistance because she was recovering from COVID-19 and had trouble breathing.[102] She enlisted help from inmate "G," who helped Officer W deliver trays.[103] Despite contracting COVID-19 around September 9, G was back delivering trays by September 12.[104] Days later, more Unit A inmates fell ill.[105]

The OSHA Complaint highlights Respondents' blatant disregard of CDC guidelines and the risk of staff spreading the virus to inmates. It states BOP directed staff "who have come in contact with, or been in close proximity to, prisoners who show or have shown

---

[100]   Reed Decl. ¶ 20; Dubray Decl. ¶ 22; Sorenson Rafai Decl. ¶ 9; Walker Decl. ¶ 19; Bohnenkamp Decl. ¶ 17; Brooks Decl. ¶ 20; Ramos Decl. ¶¶ 24, 37; Williams Decl. ¶ 29.

[101]   Brooks Decl. ¶ 20; Reed Decl. ¶ 20; Ramos Decl. ¶ 7; Hemicker Decl. ¶ 23; Dubray Decl. ¶ 22; Kasowski Decl. ¶ 18.

[102]   Hemicker Decl. ¶ 13.

[103]   Hemicker Decl. ¶¶ 13-14; Dubray Decl. ¶ 23.

[104]   Hemicker Decl. ¶ 14; Dubray Decl. ¶ 23.

[105]   Dubray Decl. ¶ 23 (tested positive for COVID-19 on Sep. 18, 2020); Hemicker Decl. ¶ 14.

symptoms of COVID-19 to *report to work* and not be self-quarantined for 14 days per the CDC guidelines."[106] In an apparent response, BOP confirmed such employees *were* required to work, but with masks.[107] And BOP has continuously refused to test its staff for COVID-19.[108]

**IV.     Respondents have failed to provide adequate medical care to infected inmates**.

Respondents' indifference to the spread of a deadly virus is bad enough, but Respondents also exhibit callous disregard for the health of inmates who contract COVID-19. Examples are shocking in nature and number:

- FCI-Waseca waited three days before hospitalizing Petitioner Malcolm, even though she was vomiting, coughing-up blood, and unable to feed herself.[109] When finally rushed to the hospital, she had double pneumonia in both lungs. The doctor told her "my friend, I have to paralyze you and put you on a ventilator or you are going to die."[110]

- After Malcolm was discharged from a 10-day hospitalization, she was locked in a "respiratory room" in the medical unit at FCI-Waseca for two weeks. She couldn't call family or have her property. She only received medical attention when she reminded staff to take her vitals. FCI-Waseca didn't

---

[106]    OSHA Complaint (emphasis added), note 64 *supra*.

[107]    *Correcting Myths & Misinformation about BOP & COVID-19*, BOP (Apr. 11, 2020) at 3, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation _bop_covid19.pdf ("BOP performs pre-screening of all employees reporting to work and requires exposed workers to wear a mask for 14 days after last exposure.").

[108]    *Prison Safety During Coronavirus Pandemic*, Hrg. Before S. Jud. Comm. (June 2, 2020) at 1:05:57-1:06:00 (statement of BOP Med. Director Dr. Jeffrey Allen), https://www.c-span.org/video/?472615-1/senate-judiciary-hearing-prison-safety-coronavirus-pandemic; Casarez Decl. ¶ 13.

[109]    Malcolm Decl. ¶¶ 5-8. 11-12, 14-15; *see also* Ramos Decl. ¶ 23.

[110]    Malcolm Decl. ¶ 12.

provide her assistance in dressing or getting in bed, forcing her to sleep on the floor. For days, she had no pillow or extra blanket, despite the chill.[111]

- Pain-relief for Petitioners in the SHU with COVID-19 symptoms such as severe headaches and body aches was delayed, and in some situations, completely denied. Petitioners requesting pain-relief were told to wait to buy medication from the commissary on a specified day. Some waited days for basic medication like Tylenol or even an inhaler.[112] Others didn't receive pain medication or their prescriptions their entire time in the SHU.[113] They were given shots and nebulizer treatments in unsanitary places like mop closets or staff bathrooms.[114]

- Respondents give steroid shots to COVID-19-positive inmates, despite this being contraindicated in mild cases of the disease.[115] Either (1) Respondents are giving a contraindicated treatment to COVID-19-positive inmates with mild cases or (2) the cases aren't actually "mild" and require outside medical professionals to determine the appropriate course of treatment. If the former, Respondents subject the inmates to risk of worse outcomes. If the latter, Respondents are withholding necessary medical care.[116]

- Respondents shut down the medical unit due to COVID-19, requiring Petitioners to submit paperwork—"sick call"—to request help. Sick calls are routinely unanswered.[117] Prescriptions go unfilled.[118] Medical staff has attended to an inmate only after a guard or caseworker is so alarmed by her

---

[111]   *Id.* ¶¶ 16-18.

[112]   Inabnit Decl. ¶ 19; Bohnenkamp Decl. ¶ 15; Dubray Decl. ¶ 28; Hemicker Decl. ¶ 19; Kasowski Decl. ¶¶ 9, 10.

[113]   Sorenson Rafai Decl. ¶ 17; Williams Decl. ¶ 13.

[114]   Bohnenkamp Decl. ¶ 14; Casarez Decl. ¶ 19; Dubray Decl. ¶ 32; Ramos Decl. ¶ 21; Williams Decl. ¶ 24.

[115]   Baston Decl. ¶¶ 55, 118.

[116]   Baston Decl. ¶ 118.

[117]   Kasowski Decl. ¶¶ 8, 10; Williams Decl. ¶¶ 15-16; Malcolm Decl. ¶¶ 5, 8; Inabnit Decl. ¶ 29.

[118]   Kasowski Decl. ¶ 10.

condition they personally seek help.[119] Even calls from emergency phones by inmates on behalf of ailing roommates don't result in immediate care.[120]

## V.     Respondents are placing Petitioners at grave risk.

Each Petitioner[121] suffers from at least one comorbidity that increases their risk of serious illness or death from COVID-19, according to the CDC.[122] These women did nothing to deserve a death sentence or the lingering repercussions of COVID-19. Yet, because BOP "is continuing to make critical errors in its handling of COVID-19,"[123] the threat to Petitioners remains ongoing and acute.

At current population, inmates at FCI-Waseca cannot comply with CDC guidelines for social distancing, a "cornerstone" of risk reduction in prisons.[124] But Respondents refuse to take available steps to protect the inmates, for example, by transferring to home

---

[119]    Malcolm Decl. ¶ 11; Ramos Decl. ¶ 27; Williams Decl. ¶ 9.

[120]    Dubray Decl. ¶ 19; Casarez Decl. ¶ 24; Brooks Decl. ¶¶ 25-27; Casarez ¶¶ 15, 24.

[121]    Bohnenkamp Decl. ¶ 16 (Hepatitis C, Adult Onset Stills Disease, autoinflammatory disease); Brooks Decl. ¶ 10 (Graves Disease (autoimmune disease), hypothyroidism, hypertension); Casarez Decl. ¶ 5 (BMI of 42, hypothyroidism, hypertension); Dubray Decl. ¶ 3 (BMI of 34, anemia, persistent cough); Hemicker Decl. ¶ 3 (BMI of 44.8, borderline diabetic); Inabnit Decl. ¶ 35 (BMI of 38.3, diverticulitis); Kasowski Decl. ¶ 3 (hypertension, BMI of 33); Malcolm Decl. ¶ 3 (Type II diabetes, stress-induced cardiomyopathy, asthma, BMI of 34.3); Martin Decl. ¶ 5 (moderate to severe asthma); Ramos Decl. ¶ 31 (hypertension, BMI of 57.1); Reed Decl. ¶ 29 (smoker); Sorenson Rafai ¶ 3 (hypertension, BMI of 44.8); Walker Decl. ¶ 6 (hypertension, chronic asthma); Williams Decl. ¶ 4 (chronic kidney disease-stage 3, hypertension, asthma, prediabetic).

[122]    Baston Decl. ¶¶ 34-115; Sullivan Decl. ¶ 13.

[123]    Sullivan Decl. ¶¶ 13, 15, 16, 18-31.

[124]    *See Interim Guidance on Mgmt. of Coronavirus Disease 2019 in Corr. & Detention Facilities*, Ctrs. for Disease Control & Prevention (Mar. 23, 2020), at 4 ("*CDC Interim Corr. Facility Guidance*"), https://www.cdc.gov/coronavirus/2019- ncov/community/correction-detention/guidance-correctional-detention.html.

confinement non-violent and medically-vulnerable inmates.[125] Meanwhile, Respondents are actually *repealing* protections previously instituted. They reopened the cafeteria[126] and Unit B inmates (rather than staff) serve food facility-wide.[127] UNICOR not only reopened but announced *mandatory* overtime, so hundreds from different units sit elbow-to-elbow for nearly 70 hours per week.[128] And Respondents continue to bus in new, possibly-infected inmates.[129] These inmates are placed together in a Unit A range, which is exactly how the first outbreak began.[130]

Although Respondents consider infected inmates "recovered" after 10-14 days, the science—and many of Petitioners' experiences—show they're wrong.[131] Even *months* after contracting COVID-19, many Petitioners are still sick, using nebulizers, suffering asthma attacks, getting steroid shots, taking antibiotics, and requiring chest x-rays.[132] But even those without lingering symptoms face worse outcomes if they are re-infected with the virus.[133] By mid-December, the speculative 90-day immunity period for all Petitioners who

---

[125]     Reed Decl. ¶¶ 29-30; Rafai Decl. ¶ 3; Walker Decl. ¶ 6; Bohnenkamp Decl. ¶ 16; Brooks Decl. ¶ 10-11; Dubray Decl. ¶ 3; Hemicker Decl. ¶ 3; Inabnit Decl. ¶ 34; Kasowski Decl. ¶ 3; Malcolm Decl. ¶¶ 1, 3, 14-15; Ramos Decl. ¶¶ 14, 31; Williams Decl. ¶¶ 4, 6.

[126]     Brooks Decl. ¶ 46; Walker Decl. ¶ 23; Reed Decl. ¶ 35.

[127]     Brooks Decl. ¶ 46; Reed Decl. ¶¶ 16-18.

[128]     Hemicker Decl. ¶¶ 17-18.

[129]     Reed Decl. ¶ 22; Hemicker Decl. ¶ 24; Inabnit Decl. ¶ 37.

[130]     *See* Martin Decl. ¶ 33; Malcolm Decl. 27.

[131]     Sullivan Decl. ¶ 29.

[132]     *See* Sorenson Rafai Decl. ¶ 22; Ramos Decl. ¶ 28; Hemicker Decl. ¶¶ 16; Malcolm Decl. ¶ 31.

[133]     Franco-Paredes Decl. ¶ 22; Baston Decl. ¶ 21; *Malam* Exh. 8, ¶ 28.

contracted COVID-19 will have expired.[134] The time to protect them is now, before it's too late.

## Legal Standards

Under Federal Rule of Civil Procedure 65, temporary or preliminary relief is appropriate when the movant establishes: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of the requested relief; (3) the balance of the hardship tips in its favor; and (4) that its request is in the public interest. *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989) (citing *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109 (8th Cir. 1981)).

Courts may issue injunctions benefitting nonparties before class certification. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 374 (5th Cir. 1981) (injunctions benefitting nonparties may be proper); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (class-wide relief may be appropriate even in individual actions); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) (injunctions may benefit nonparties and class-wide injunctions may be appropriate in individual actions).

---

[134] Ramos Decl. ¶¶ 10-11 (8/31 positive test); Sorenson Rafai Decl. ¶ 11 (8/31 positive test); Williams Dec. ¶ 7 (8/31 positive test); Inabnit Decl. ¶ 16 (8/21 positive test ); Bohnenkamp Decl. ¶ 3 (9/1 positive test ); Casarez Decl. ¶ 20 (mid-September positive test); Dubray Decl. ¶ 18 (9/18 positive test); Hemicker Decl. ¶ 3 (9/9 positive test); Kasowski Decl. ¶ 6 (9/9 positive test).

## Argument

I.   **Petitioners will likely succeed on the merits**.

A.   **Respondents are violating Petitioners' Eighth Amendment rights**.

The Eighth Amendment guarantees prisoners "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). It "requires that inmates be furnished with the basic human needs, one of which is reasonable safety[,]" and it's "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (internal marks and citations omitted). Thus, "[d]eliberate indifference to [the] serious medical needs of prisoners" runs afoul of the Eighth Amendment's guarantee. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

Eighth Amendment claims involve a two-pronged inquiry. *Helling*, 509 U.S. at 35-37. The first, objective prong, is whether "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* at 36.

The second, subjective prong requires "inquiry into the prison officials' state of mind" based on the "deliberate indifference" standard. *Id.* at 32. An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Davis v. Oregon Cty.*, 607 F.3d 543, 548 (8th Cir. 2010). A "prison

23

official may be held liable under the Eighth Amendment for [acting with 'deliberate indifference' to inmate health or safety] only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. *See also DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990) (intentional deprivation of medical care isn't required; responding to a disease "outbreak with a series of negligent and reckless actions" is sufficient).

The first prong is satisfied—COVID-19 has led entire nations to shut-down to avoid its risks. Courts consistently find the risk of COVID-19 satisfies the first prong. *See, e.g.*, *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020); *Banks v. Booth*, 459 F. Supp. 3d 143, 153-54 (D.D.C. 2020); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020); *Wragg v. Ortiz*, 462 F. Supp. 3d 476, 507 (D.N.J. 2020).

The second prong is also satisfied. First, Respondents have been on notice for months of the dangerous risk created by COVID-19. In mid-March, the WHO declared COVID-19 a "pandemic," and President Trump and Governor Walz declared peacetime emergencies.[135] On April 3, AG Barr acknowledged "significant levels of infection at several [BOP] facilities."[136] Indeed, BOP's ten-phase "action plan" demonstrates Respondents knew COVID-19 posed substantial risks to prisoners—"[We] ha[ve] been planning for coronavirus (COVID-19) *since January 2020*."[137] *See also*, *Wilson*, 961 F.3d

---

[135]     *See* notes 4, 5, *supra.*

[136]     Barr Mem. at 1, note 52, *supra.*

[137]     *Fed. Bureau of Prisons COVID-19 Action Plan*, BOP (updated Mar. 13, 2020) (emphasis added), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

at 840 (holding, on June 9, "[t]here is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at [the facility] through exposure to the COVID-19 virus."); *Martinez-Brooks*, 459 F. Supp. 3d at 441 (holding, on May 12, "it cannot be disputed that the Respondent Warden knew of the substantial risk of serious harm posed by the COVID-19 outbreak at [the facility]").

Second, it quickly became clear Respondents' plans were woefully inadequate. For example, Phase 3 of Respondents' "action plan" involved merely moving employees to telework and inventorying cleaning supplies.[138] Yet Respondents failed to recalibrate.[139] Worse, the plans proved to be little more than good intentions—worth no more than the paper they were written on—as Respondents utterly failed to follow through on them. Due to grievances filed by Petitioners,[140] multiple reports from the Office of the Inspector

---

[138]    Press Release, *Bureau of Prisons Update on COVID-19*, BOP (Mar. 24, 2020), https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update .pdf.

[139]    The last substantive phase for which Respondents promulgated COVID-19 policies was Phase 5, effective April 1, 2020. *COVID-19 Action Plan: Phase Five*, BOP (updated Mar.                                        31,                                        2020), https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.    Phases    6 through 8 did little more than extend Phase 5. *See* Exhibits D-F, Declaration of Jessica Torgerson, *Carrasco v. Fikes*, No. 20-CV-01257 (WMW-KMM) (D. Minn. Oct. 23, 2020) (ECF Nos. 26-4 to 26-6). Phase 9, effective August 5, 2020 (just before the outbreak at FCI-Waseca), rolled-back COVID-19 safety measures from earlier phases. Mem., *Coronavirus                                        (COVID-19) Phase Nine Action Plan*, BOP (Aug. 5, 2020), https://www.bop.gov/foia/docs/COVI Dphase9_08052020.pdf.

[140]    *See, e.g.*, Williams Decl. ¶¶ 15, 16; Hemicker Decl.¶ 23.

General, calls from Congress,[141] and complaints from their own staff,[142] Respondents *knew* their policies were inadequate, but failed to change course. In written responses to Petitioners' grievances, Respondent Starr parroted boilerplate language, failing to address their concerns.[143] Respondent Starr also ignored in-person pleas for help or further information.[144] These actions—or, more accurately, Respondents' inaction—are the epitome of deliberate indifference.

Prime examples of how Respondents contravened the advice of the AG, the CDC, and BOP itself include:

- Importing inmates from another facility infected with COVID-19, encouraging those inmates to answer "no," if asked about exposure, and then intermingling them with healthy inmates, even when exhibiting symptoms.[145] This contravened BOP's COVID-19 Phase Nine plan directing isolation of symptomatic inmates.[146] Respondents continue importing inmates from other facilities.[147]

---

[141]   *See, e.g.*, Petition, ECF No. 1, ¶¶ 84, 99.

[142]   *See, e.g.*, *id.* ¶ 86; OSHA Compl., note 64 *supra*.

[143]   *See, e.g.*, Ramos Decl. Ex. A at 1, 4; Williams Decl. Ex. A at 4; Hemicker Decl.¶ 23 (Respondent Starr returned a grievance because it didn't list a date and time).

[144]   Walker Decl. ¶¶ 13, 14 (Respondent Starr didn't address why Walker was in the SHU for more than three weeks despite never testing positive for COVID-19), Inabnit Decl. ¶ 21 (Respondent Starr didn't contact infected inmates' family members because COVID-19 wasn't "detrimental enough").

[145]   *See* Inabnit Decl. ¶ 15; Casarez Decl. ¶ 20; OSHA Compl., note 64 *supra*.

[146]   *COVID-19 Phase Nine Action Plan*, note 138 *supra*, at 4.

[147]   *See* Brooks Decl. ¶ 38.

- Keeping infected/exposed staff working—including, for example, Officer W, who served food as she struggled to breathe[148]—in defiance of CDC guidance calling for self-isolation of exposed staff.[149] BOP hasn't denied this violation.[150]

- Failing to provide adequate PPE and cleaning supplies,[151] failing to train staff and inmate cleaners,[152] and failing to enforce proper use and disposal of supplies BOP does provide, contrary to CDC guidance to establish PPE donning/doffing stations "directly outside spaces requiring PPE" and "[t]rain staff to move from areas of lower to higher risk of exposure if they must re-use PPE due to shortages."[153]

- Expecting inmates to work at UNICOR where it's overcrowded,[154] infected workers may intermingle with healthy workers,[155] inmates from different units interact, and where, early in the pandemic, PPE wasn't distributed.[156]

- Showing utter disregard for prisoners who fall ill, including, for example, Petitioner Malcolm who wasn't sent to the hospital for three days even though she was vomiting, coughing-up blood and unable to feed herself.[157] Upon returning from a 10-day hospital stay—where she was intubated[158]—Malcolm was locked in a "respiratory room" for two weeks, under deplorable conditions.[159]

---

[148]   Hemicker Decl. ¶¶ 12-13.

[149]   OSHA Compl., note 64 *supra*.

[150]   *Correcting Myths & Misinformation about BOP & COVID-19*, note 106 *supra*, at 3.

[151]   *See* Bohnenkamp Decl. ¶ 20; Kasowski Decl. ¶ 13; Brooks Decl. ¶ 43.

[152]   Williams Decl. ¶ 30; Bohnenkamp Decl. ¶ 20.

[153]   *CDC Interim Corr. Facility Guidance*, note 123 *supra*.

[154]   Sorenson Rafai Decl. ¶¶ 6-7.

[155]   Hemicker Decl. ¶ 17; DuBray Decl. ¶ 14; Kasowski Decl. ¶ 18; *COVID-19 Phase Nine Action Plan*, note 138 *supra*, at 4.

[156]   Cary Aspinwall et al., *Fed. Prison Factories Kept Running as Coronavirus Spread*, The Marshall Project (Apr. 10, 2020), https://www.themarshallproject.org/2020/04/1 0/federal-prison-factories-kept-running-as-coronavirus-spread.

[157]   Malcolm Decl. ¶¶ 5-8, 11-12, 14-15; *see also* Ramos Decl. ¶ 23.

[158]   Malcolm Decl. ¶ 12.

[159]   *Id.* ¶¶ 16-18.

- Failing to meaningfully deploy their statutory authority to release prisoners from custody or to home confinement, despite a congressional enactment for that very purpose and the AG's directive to "maximize appropriate transfers" "as quickly as possible."[160]

"Having a written policy in place but not fully implemented cannot protect Defendants from a finding of deliberate indifference." *Banks*, 459 F. Supp. 3d at 156. And yet a (meager) papered file is all Respondents have. Their actions—nay, their inaction—speak louder than their words and leave no doubt they acted recklessly toward the health of inmates powerless to save themselves from a deadly virus in a target-rich environment. Respondents' conduct was far from reasonable. Indeed, it seems almost designed to *accelerate* the rate of COVID-19 spread throughout FCI-Waseca—yet Respondents refuse to change course nine months into this nightmare.

These conditions are as bad or worse than those at other prisons where courts found deliberate indifference. *Martinez-Brooks*, 459 F. Supp. 3d at 441 (petitioners likely to succeed on contention failure to implement home confinement "in any meaningful numbers" was deliberate indifference); *Torres v. Milusnic*, No. CV 20-4450-CBM-PVC(x), 2020 U.S. Dist. LEXIS 131446, at *54 (C.D. Cal. July 14, 2020) (petitioners likely to succeed on Eighth Amendment claims "based on Respondents' failure to make meaningful use of the home confinement authority as expanded by the CARES Act or compassionate release"); *Brown v. Plata*, 563 U.S. 493, 500-02 (2011) (affirming conclusion of three-judge district court that prison overcrowding violated Eighth Amendment and, because no other relief would cure the violations, limiting prison

---

[160]    BOP Mem., note 52 *supra*.

population to specific percentage of design capacity, possibly requiring release of some prisoners). Thus, Petitioners are likely to prevail on their Eighth Amendment claim.

**B.     Respondents are violating the Rehabilitation Act**.

The Rehabilitation Act ("RA") provides "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *Durand v. Fairview Health Servs*., 902 F.3d 836, 841 (8th Cir. 2018). Implementing regulations require avoiding unnecessary policies, practices, criteria, or methods having the effect of discriminating against persons with disabilities. *See* 28 C.F.R. § 41.51(b)(3)(i). Discriminatory animus isn't required—"the type of discrimination Congress sought to remedy with the RA was the type resulting from 'thoughtlessness and indifference—of benign neglect.'" *Durand*, 902 F.3d at 841 (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)). The elements of an RA claim are: (1) claimants have a qualified disability, (2) respondents received federal funding, and (3) respondents failed to make reasonable modifications accommodating claimants' disabilities. *Durand*, 902 F.3d at 841.

Subclass III Petitioners (and by definition, the Subclass) are individuals with a qualified disability. The RA incorporates the ADA's definition of "disability." 29 U.S.C. § 794(a) (citing 42 U.S.C. § 12102, which defines "disability" as including "a physical or mental impairment that substantially limits one or more major life activities of such individual"). "Physical or mental impairment" is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems,

such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs) cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" and "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2). *See also Richards v. Minnesota*, No. CV 13-3029 (JRT/JSM), 2016 U.S. Dist. LEXIS 164655, at *15 (D. Minn. Nov. 29, 2016) (diabetes is an impairment that may constitute a disability under the ADA "and, by equivalence," the RA).

Petitioners Malcolm (diabetes, stress-induced cardiomyopathy, asthma), Williams (chronic kidney disease-stage III, hypertension, asthma, major back pain), Brooks (asthma, hypertension, Graves' Disease, hyperthyroidism), and Walker (chronic asthma, hypertension, arthritic knee) each have physical impairments substantially limiting one or more life activities within the RA's meaning.[161] Accordingly, element (1) is met.

Petitioners also meet element (2): Respondents, an FCI warden and the BOP Director, receive Federal financial assistance.[162]

---

[161]    Malcolm Decl. ¶ 3; Williams Decl. ¶ 4; Brooks Decl. ¶ 10; Walker Decl. ¶¶ 6, 9.

[162]    *See, e.g.*, Congressional Research Service, *Overview of FY2020* at 1 (Jan. 29, 2020), https://fas.org/sgp/crs/misc/R45702.pdf.

As to element (3), the issue is whether Respondents "failed to provide [the Subclass III Petitioners] accommodations such that [they were], by reason of [their] disability, excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or were otherwise subjected to discrimination by the [prison]." *Maxwell v. Olmsted Cty.*, No. CV 10-3668 (MJD/AJB), 2012 U.S. Dist. LEXIS 17472, at *8 (D. Minn. Feb. 13, 2012) (finding jail's failure to provide accessible bathing facilities to disabled inmate violated ADA) (internal marks and citations omitted); *Durand*, 902 F.3d at 841 (noting that case law interpreting ADA and RA is interchangeable).

The Subclass III Petitioners will likely prevail in establishing Respondents failed to make reasonable accommodations, including failing to mitigate the higher risks Petitioners face from COVID-19 due to their disabilities, such that they're being denied participation in the prison's services, programs, and activities. For example:

- Malcolm is denied safe access to phones or computers due to Respondents' failure to enforce COVID-19 prevention strategies; upon returning from a hospital, she was locked in a room for two weeks with no staff to assist with walking, dressing, or using the toilet; because she couldn't climb into bed unassisted, she slept on the floor; she stopped taking prescriptions because she couldn't walk to get them; because Respondents don't enforce mask-wearing or social distancing in television rooms, she is denied the ability to safely watch television.[163]

- Williams is denied safe access to the cafeteria because food is prepared by inmates from another unit, requiring her to purchase meals from the commissary; when she tested positive for COVID-19, she was forced to stay in the SHU as if being punished, including being denied access to a phone to inform family of her condition, being denied access to her belongings, and

---

[163]    Malcolm Decl. ¶¶ 9, 16, 17, 26, 29.

being forced to sleep on the concrete floor because back-pain prevented her from accessing the top bunk assigned her.[164]

- Brooks is denied safe access to the phones and television due to Respondents' failure to enforce COVID-19 prevention strategies; to avoid crowds, she must wait to be last to get meals.[165]

- Walker spent three weeks in the SHU, used to isolate inmates for punishment or who test positive for COVID-19, although she fit neither category; while there, Respondents denied her phone access, except for two phone calls, and access to other parts of the facility, and forced her to sleep on the floor because her arthritic knee prevented her from accessing the top bunk assigned her.[166]

In short, the Subclass III Petitioners are likely to prevail on their claims that Respondents have discriminated against them in violation of the RA. Because of the higher risks they face from COVID-19, the only practical accommodation to ensure unlawful discrimination doesn't continue is release.

## II. Irreparable harm is likely.

Loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because, as addressed above, Petitioners will likely prevail on their Eighth Amendment claim, no further showing of irreparable injury is required. *See Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("The denial of a constitutional right is a cognizable injury, and an irreparable harm") (citations omitted); *accord Pavek v. Simon*, No. 19-cv-3000 (SRN/DTS), 2020 U.S. Dist. LEXIS 103989, at *66 (D. Minn. June 15, 2020).

---

[164]   Williams Decl. ¶¶ 10, 14, 35.

[165]   Brooks Decl. ¶¶ 63-64.

[166]   Walker Decl. ¶¶ 4, 8-10.

Moreover, Petitioners face an additional, obvious risk of irreparable harm in the form of serious illness or death. *See Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury."); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment."); *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993) ("We entertain no question but that irreparable injury exist[s]" when the harm contemplated is "a life threatening illness.")

FCI-Waseca is a COVID-19 super-spreader location, and it's likely only a matter of time before Petitioners and the Class, all of whom are medically-vulnerable individuals, contract or re-contract the virus.

Multiple courts have held that continued imprisonment at COVID-19 hotbeds like FCI-Waseca will "more likely than not" result in irreparable harm, including courts in the Eighth Circuit. *See Frazier v. Kelley*, 460 F. Supp. 3d 799, 845 (E.D. Ark. 2020); *see also Wilson*, 961 F.3d at 844 ("The district court correctly noted that inmates at Elkton face a risk of irreparable injury if they are infected by COVID-19."); *Castillo v. Barr*, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020); *Thakker v. Doll*, 451 F. Supp. 3d 358, 369-70 (M.D. Pa. 2020); *Banks*, 459 F. Supp. 3d at 159; *Martinez-Brooks*, 459 F. Supp. 3d at 447-48; *Torres*, 2020 U.S. Dist. LEXIS 131446, at *54.

**III.    The balance of equities and the public interest favor releasing vulnerable inmates and complying with CDC guidelines.**

When the government opposes the issuance of a temporary restraining order, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor preliminary relief here.

First, Petitioners' interest in release, subject to appropriate health and safety precautions, is extremely weighty, for all the reasons discussed above. Petitioners have a high chance of contracting or re-contracting COVID-19 in Respondents' custody; they have a disproportionate chance their infection will be severe, causing long-lasting damage or even death; and Respondents have demonstrated their unwillingness to provide sick inmates the care needed for recovery.

Second, Petitioners' requested relief is also in the interest of both the public and Respondents. "[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008) ("[T]he protection of constitutional rights is always in the public interest."). Likewise, public interest is served by enforcing the RA. *See Gibson v. Ark. Dep't of Corr.*, 265 F.3d 718, 722 (8th Cir. 2001) (the Congress authorized enforcement of the RA through equitable orders targeting discriminatory conduct).

The Government also has a legitimate interest in protecting public health. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1019, 1021 (8th Cir. 2012). Granting Petitioners'

requested relief will protect not only their health, but that of all inmates and employees at FCI-Waseca. It will also protect the health of the local community. First, reducing the population at FCI-Waseca will reduce the burden on local hospitals and frontline workers at a time when COVID-19 rates are spiking by reducing the likelihood of infection in the first place and by reducing the chance that any outbreak will be widespread. Second, releasing vulnerable individuals will prevent FCI-Waseca from becoming a vector for further infections within the community. *See Thakker*, 451 F. Supp. 3d at 372 ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest, and the release of . . . fragile Petitioners from confinement is one step further in a positive direction.").

Petitioners anticipate Respondents will argue there are "law and order" concerns in releasing inmates. Petitioners' request, however, contemplates release to home confinement, where BOP can monitor movement and behavior to ensure compliance with applicable laws and rules. In any event, with one exception,[167] Petitioners are serving sentences for drug or fraud crimes and, by virtue of their imprisonment at FCI-Waseca, BOP has presumably assessed all Petitioners as "low" or "minimum" security risks.

## IV. The Court shouldn't require a bond.

The Court may waive security. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). Because (1) important constitutional

---

[167] The exception is Petitioner DuBray, but she has served 88% of her sentence, and her current BOP security level is the lowest. *See* DuBray Decl. ¶ 2. Additionally, she has completed multiple vocational and educational courses and has no prior criminal history. *See United States v. Dubray*, 3:07-cr-30030, Dkt. 39 at 13-14.

rights of public interest are at stake, (2) Respondents won't be damaged from wrongful issuance of a TRO, and (3) Petitioners are indigent wards of the State who cannot afford a bond, this Court should waive security here.

## Conclusion

Absent this Court's immediate intervention, Petitioners and the Class will remain at imminent risk of serious illness and death from COVID-19 as Respondents continue to violate their constitutional and statutory rights by condemning them to live in close-quarters without adequate social distancing and other COVID-19 prevention and treatment measures. For the reasons herein, the Court should order Petitioners' immediate release from custody and/or to home confinement. The Court should also order the release or home confinement of all persons currently or in the future imprisoned at FCI-Waseca during the COVID-19 pandemic who are either 50 and older or who experience at least one medical condition that makes them uniquely vulnerable to risk of serious illness or death as a result of being infected or re-infected with COVID-19.

In the alternative, the Court should order Respondents to immediately implement social distancing, quarantine, and hygiene measures, essential to lowering the risk of COVID-19 disease and death, and modifications necessary for those subclass members with a qualifying disability under the RA.

Dated: December 18, 2020

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

By: _/s/ Teresa Nelson_

Teresa Nelson (No. 0269736)
Ian Bratlie (No. 0319454)
Clare Diegel (No. 0400758)
Isabella Salomão Nascimento (No. 0401408)
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
Email: tnelson@aclu-mn.org
cdiegel@aclu-mn.org
ibratlie@aclu-mn.org
inascimento@aclu-mn.org

BALLARD SPAHR LLP

By: _/s/ Leita Walker_

Wallace G. Hilke (No. 175857)
Jonathan M. Bye (No. 148830)
Leita Walker (No. 387095)
80 South Eighth Street
2000 IDS Center
Minneapolis, MN 55402-2119
Tel: (612) 371-3211
Email: hilkew@ballardspahr.com
byej@ballardspahr.com
walkerl@ballardspahr.com

*Counsel for Petitioners*